IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2017

## STATE OF TENNESSEE v. DEMARCUS LASHAWN BLACKMAN

**Appeal from the Circuit Court for Marshall County**
**No. 15-CR-117     Franklin Lee Russell, Judge**

———————————

## No. M2016-01828-CCA-R3-CD

———————————

The Defendant, Demarcus Lashawn Blackman, was convicted by a Marshall County Circuit Court jury of aggravated criminal trespass and evading arrest, Class A misdemeanors. *See* T.C.A. §§ 39-14-406 (2014) (aggravated criminal trespass), 39-16-603 (2014) (amended 2016) (evading arrest).  The trial court sentenced him to consecutive terms of eleven months, twenty-nine days for each conviction and ordered the sentence to be served consecutively to an unrelated twelve-year sentence.  On appeal, he contends that his sentence is excessive.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Donna Orr Hargrove, District Public Defender, and William J. Harold and Michael J. Collins, Assistant District Public Defenders, for the appellant, Demarcus Lashawn Blackman.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Robert J. Carter, District Attorney General; and William B. Bottoms, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was charged with aggravated criminal trespass, evading arrest, possession of cocaine with the intent to sell, and possession of cocaine with the intent to deliver.  At the trial, Lewisburg Police Sergeant Chris Sawyers testified that on July 3, 2015, at about 2:00 a.m., he saw a car with no license plate light.  The car ran a stop sign while making a turn, and Sergeant Sawyers activated his blue lights and siren.  He could see two men inside.  The driver made two turns and stopped the car two to three minutes

later. Before Sergeant Sawyers left his police cruiser, he saw two African-American men leave the car and "[take] off running," and Sergeant Sawyers called for backup. Sergeant Sawyers described the driver, later identified as the Defendant, who had long dreadlocks and wore a white t-shirt, and the passenger, who had short hair and wore a blue shirt. The Defendant and the other man had run in opposite directions. Sergeant Sawyers noted that the Defendant had looked toward Sergeant Sawyers as he left the car and that he had seen the Defendant's face. Between forty-five minutes and one hour after the initial traffic stop, Sergeant Sawyers went to the rear of an apartment, where Officer Lonnie Cook had detained the Defendant.

On cross-examination, Sergeant Sawyers testified that the traffic pursuit only spanned two blocks. The camera in Sergeant Sawyers's police cruiser was not working at the time of the incident.

Lewisburg Police Officer Lonnie Cook testified that when he arrived at the location of the traffic stop, Sergeant Sawyers described the two men, and Officer Cook and other officers searched unsuccessfully for the men. As Officer Cook drove, two young women flagged him down. He said that after speaking to the women, he looked for a "dark colored" Nissan Altima driven by a Caucasian man who was accompanied by an African-American man, who had long dreadlocks and wore a white shirt and matched the description provided by Sergeant Sawyers. Officer Cook said that about 2:30 a.m., he saw a Nissan Altima matching the description provided by the two women and that he followed the vehicle. The Nissan pulled over onto the side of the road, and Officer Cook pulled his police cruiser alongside it. Officer Cook saw the driver, a Caucasian man, and the passenger, who was later identified as the Defendant, an African-American man who had long dreadlocks. The Defendant exited the car and ran, and Officer Cook stood beside his police cruiser and shouted at him. The Defendant turned and responded, "Who me?" and Officer Cook told him he wanted to talk. The Defendant ran, and Officer Cook followed and yelled at the Defendant to stop. The Defendant and Officer Cook ran through the backyards of houses and jumped over "fences, little rock walls."

Officer Cook testified that he lost sight of the Defendant. Officer Cook returned to his police cruiser and saw that the Nissan and its driver were gone. Officer Cook saw the Defendant behind a church, and the Defendant ran again. Officer Cook chased the Defendant toward a nearby apartment complex. He said he saw people inside an apartment pushing the Defendant out of the apartment and the Defendant's throwing something as the Defendant went down concrete steps in front of the apartment. Officer Cook drew his gun, ordered the Defendant onto the ground, and held the Defendant at gunpoint until another officer arrived and Officer Cook could handcuff him. Officer

Cook noted that the Defendant threw something about five feet away from where Officer Cook handcuffed him.

Officer Cook testified that he saw two clear plastic bags containing a white substance on the ground in the area where he had seen the Defendant throw something. The Defendant's cell phone was on the ground near where he had been handcuffed, and Officer Cook noted that the cell phone and plastic bags were dry, although the grass was wet.

Officer Cook examined the cell phone's text messages to determine to whom the cell phone belonged, and he saw messages addressed to "Gucci." He stated that the Defendant's nickname was Gucci. Officer Cook collected the plastic bags as evidence, the substance inside the bags field tested positive for cocaine, and Officer Cook ordered laboratory testing. He noted the powder in one bag weighed 6.05 grams, and the powder in the second bag weighed 12.52 grams.

On cross-examination, Officer Cook testified that when he arrived at the apartment, the Defendant walked backward as Eric Darling walked forward with his hands on the Defendant. He agreed that two people followed Mr. Darling and that the three people were close to the Defendant.

On redirect examination, Officer Cook testified that only Mr. Darling put his hands on the Defendant and that no one had their arms around the Defendant when the Defendant was on the steps.

Joshua Bailey testified that on July 2, 2015, he lived in an apartment with his children, brother, and sister, all of whom were minors. When Mr. Bailey arrived at home around 1:00 a.m., he opened his side door, which also had a screen door, to allow the breeze to come in, watched television, drank beer, and listened to music with Mr. Darling, his coworker. The lights were on in the living room, the kitchen, and outside the apartment. About fifteen or twenty minutes after he arrived home, Mr. Bailey went into his kitchen to get a drink, and he heard his screen door, which had been locked, "bust open." He noted that some force was required to open the door when it was locked and that he was startled. Mr. Bailey saw a man he knew as "Gucci," later identified as the Defendant, "barge" inside the apartment, and Mr. Bailey asked him what he was doing. Mr. Bailey told the Defendant to get out of his house because the Defendant had a bad reputation. The Defendant tried to bribe Mr. Bailey, said "the boys" were "after" him, and placed his foot such that Mr. Bailey could not open the door. The Defendant asked what Mr. Bailey needed, said he had anything Mr. Bailey wanted, and told him, "I've got you," although the Defendant did not mention money. Mr. Bailey was concerned for his

and his children's safety and told the Defendant that he did not need anything and that he wanted the Defendant to leave. Mr. Bailey grabbed a knife from the kitchen, but the Defendant continued to ask for a place to hide until his "girl" could pick him up. Mr. Bailey agreed that he made it clear to the Defendant that he was not welcome and that he told the Defendant to leave multiple times.

Mr. Bailey testified that Mr. Darling removed the Defendant from the apartment and that the Defendant tried to reenter the apartment when the men saw headlights, flashlights, or police lights nearby. Mr. Darling stopped the Defendant from reentering, and two police officers detained the Defendant.

Eric Darling testified that he and Mr. Bailey got off of work around 11:00 p.m. on July 2, and that he met Mr. Bailey at Mr. Bailey's apartment. They watched television in the living room. About thirty minutes after he arrived, he heard the side door slam. Mr. Darling heard Mr. Bailey say, "What are you doing?" When Mr. Darling got up, he saw the Defendant, whom he had met previously while playing "pick-up" basketball. Mr. Darling noted that the Defendant had long dreadlocks. The Defendant had closed the main door and stood in a position that prevented anyone from opening the door. The Defendant said that "they" were outside and were going to "get" him, and Mr. Bailey responded that he did not care and wanted the Defendant out of his house. The Defendant did not want to leave and asked Mr. Bailey, "What do you want? I got money, anything you need, I got you." Mr. Bailey responded that he did not want anything and that he wanted the Defendant to leave. The Defendant said that he knew Mr. Darling, and Mr. Darling told the Defendant that Mr. Bailey did not want the Defendant in his house and that the Defendant had to leave. Mr. Darling opened the door, pushed the Defendant, and the Defendant went down the steps and ran. Mr. Darling and the other adults stood outside the apartment and saw the Defendant run around a nearby church and back toward the apartment's door. Mr. Darling heard someone say, "Freeze, stop." The Defendant ran up the apartment steps, stumbled backward because he was out of breath, and "just gave up." Mr. Darling stood near his car while police officers placed the Defendant on the ground and handcuffed him.

The State read into evidence a deposition taken from Tennessee Bureau of Investigation forensic scientist Special Agent Brandi Fisher, an expert in forensic chemistry, who testified that she tested the contents of the plastic bags, which were white powder and a rock-like substance. The white powder weighed 4.85 grams and tested positive for cocaine, and the rock-like substance weighed 10.39 grams and tested positive for cocaine base.

Upon this evidence, the Defendant was convicted of aggravated criminal trespass and evading arrest. He was acquitted of possession of cocaine with the intent to sell and possession of cocaine with the intent to deliver. The trial court sentenced the Defendant to consecutive terms of eleven months, twenty-nine days at seventy-five percent service and ordered his effective sentence to run consecutively to a twelve-year sentence in an unrelated case. This appeal followed.

The Defendant contends that his sentence is excessive, arguing that it is a waste of jail resources and an abuse of discretion under the facts of the case to order the maximum sentence length and consecutive service. Specifically, the Defendant argues that the court misapplied the three enhancement factors which the court found applicable. The State responds that the trial court did not abuse its discretion. We agree with the State.

At the sentencing hearing, Jenna Miller testified that she prepared the Defendant's presentence report in connection with another case. She stated that the Defendant was on probation when he committed the offenses in the present case. She noted that although the Defendant's previous probation had been set to expire on June 3, 2015, and the relevant offenses occurred on July 3, 2015, a March 12, 2015 probation violation warrant was not adjudicated until October 14, 2015. She said that therefore, the Defendant's probation had not expired on July 3, 2015.

The presentence report was received as an exhibit and reflected that the Defendant was age twenty-nine and that on February 23, 2016, he was convicted of the sale and delivery of cocaine. The Defendant's prior criminal record included three counts of failure to appear, four counts of possession of marijuana, two traffic violations, and one count each of casual exchange, disorderly conduct, assault, and possession of a weapon with the intent to go armed. The report reflected seven violations of probation. The report also noted two active Bedford County arrest warrants for theft and a pending Marshall County assault case. The Defendant reported alcohol use from ages sixteen to twenty-eight and marijuana use from ages seventeen to twenty-eight, at which point he went to prison. The Defendant had four children and multiple immediate family members. He described his childhood environment as "fortunate," and he reported good physical and mental health. He reported having worked at different construction companies, a sporting goods store, and a transportation company. At the sentencing hearing, the Defendant made a statement and requested leniency and concurrent sentencing.

The trial court stated that although the two convictions in the present case were for misdemeanor offenses, the felony sentencing requirements set out in the Sentencing Reform Act informed its judgment. The court found that mitigating factor (1) applied but

did not give the factor "significant weight at all." *See* T.C.A. § 40-35-113(1) (2014) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury[.]"). It found that enhancement factors (1), (8), and (13) applied. *See* T.C.A. § 40-35-114(1), (8), (13)(C) (Supp. 2015) (amended 2016, 2017) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]") ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]") ("At the time the felony was committed . . . the defendant [was r]eleased on probation[.]"). The court noted the "multitude" of probation violations and revocations documented in the presentence report. Based upon the enhancement factors, the court found that the maximum sentence of eleven months, twenty-nine days at seventy-five percent service was appropriate for each count.

Relative to consecutive sentencing, the trial court noted that the Defendant had a twelve-year sentence in a recent, unrelated case and that it applied a presumption in favor of concurrent sentencing. The court found that the Defendant had an extensive criminal record and that although the record was "not the worst I've ever seen," it applied factor (2) in favor of consecutive sentencing. *See id*. § 40-35-115(b)(2) (2014) ("The defendant is an offender whose record of criminal activity is extensive[.]"). The court found that factor (6) applied because the offenses were committed while the Defendant was on probation. *See id*. § 40-35-115(b)(6) ("The defendant is sentenced for an offense committed while on probation[.]"). The court ordered the sentences to be served consecutively to one another and consecutively to the twelve-year sentence.

The trial court found that the Defendant was not a favorable candidate for alternative sentencing. The court found that the Defendant did not have the potential for rehabilitation because the Defendant had violated his probation "every time or almost every time he's been on any kind of suspended sentence." *See id*. § 40-35-103(5) (2014) ("The . . . lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative[.]"). The court noted that defense counsel did "a brilliant job" and that the court would have convicted the Defendant of the drug-related charges.

Tennessee Code Annotated 40-35-302(b) (2014) governs misdemeanor sentencing, which requires a trial court to impose a specific sentence consistent with the purposes and principles of the Sentencing Act. Likewise, if a trial court orders a defendant to serve a sentence in confinement, the court must fix a percentage of the sentence a defendant is required to serve. *Id*. § 40-35-302(d). Although a trial court is not required to hold a sentencing hearing, the court must permit the parties to address "the length of any sentence and the manner in which the sentence is to be served." *Id*. §

40-35-302(a). Trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations, and defendants convicted of misdemeanors are not presumed eligible for alternative sentencing. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *see State v. Combs*, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996); *see also State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). Likewise, "there is no presumptive minimum sentence provided by law for misdemeanors." *State v. Seaton*, 914 S.W.2d 129, 133 (Tenn. Crim. App. 1995). In determining the percentage of service for misdemeanors, a trial court must consider the purposes and principles of sentencing and the enhancement and mitigating factors and must not impose arbitrary incarceration. T.C.A. § 40-35-302(d); *see Troutman*, 979 S.W.2d at 274 (stating that "while the better practice is to make findings on the record when fixing a percentage of a . . . sentence to be served in incarceration, a . . . court need only consider the principles of sentencing and enhancement and mitigating factors . . . to comply with the legislative mandates of the misdemeanor sentencing statute").

This court reviews challenges to sentences imposed for felony offenses relative to the manner of service within an appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The same standard of review applies to questions related to probation or any other alternative sentence. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Although our supreme court has not considered whether the abuse of discretion with a presumption of reasonableness standard applies to misdemeanor sentencing determinations, it has stated that the standard "applies to all sentencing decisions," and this court has previously applied the standard to misdemeanor sentencing. *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014); *see State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *6-8 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013); *see also* T.C.A. § 40-35-401(d) (2014) (stating that all sentencing issues raised pursuant to Code section 40-35-401(a) are subject to the same standard of review).

Generally, compliance with the purposes and principles of sentencing requires a trial court to consider any evidence received at the trial and sentencing hearing, the presentence report, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see* T.C.A. §§ 40-35-103 (2014), -210 (2014); *see also* T.C.A. § 40-35-102 (2014).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

In the present case, the record reflects that the trial court considered the appropriate principles of sentencing, the facts of the case, enhancement and mitigating factors, the Defendant's statement on his behalf, and the presentence report. The record supports the court's determination relative to enhancement factors. The court found, and the record supports, that the Defendant had an extensive criminal history, that he committed the offenses in this case while on probation, and that he had violated the terms of almost every previous alternative sentence he had received. The presentence report reflects that the Defendant had sixteen prior convictions and seven probation violations, and Ms. Miller testified that he was on probation at the time the offenses occurred. The court did not abuse its discretion by imposing the maximum length of sentence and percentage of jail service allowed by statute, and the Defendant is not entitled to relief on this basis.

Relative to consecutive sentencing, the trial court's determination is supported by the record. The court found that the Defendant had an extensive criminal history and that the Defendant committed the offenses while on probation. Either factor, standing alone, is sufficient to support consecutive sentencing. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

Based on the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE